**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOEL SHANKS** _and_ **RICKY SHANKS,**

                    **Plaintiffs,**              **1:06-CV-1399**
                                            **(GLS/DRH)**

          **v.**

**VILLAGE OF CATSKILL BOARD OF**
**TRUSTEES; VILLAGE OF CATSKILL**
**FIRE DEPT.; VILLAGE OF CATSKILL**
**FIRE COMPANY INC.; RANDY**
**ORMEROD; FLOYD PRINCE, JR.;**
**JACK ORMEROD, SR.; NEAL**
**RUSSELL;  JOHN DARLING, 3RD; JIM**
**CHEWENS; STEVE SCHULTZ; HANK**
**COONS; JOHN DEES; RICK**
**CHEWENS; HAROLD RIVENBURG;**
**FOREST COTTON; ANGELO W.**
**AMATO; JOSEPH KOZLOSKI; PAUL**
**OVERBAUGH; VINCENT SEELEY** _and_
**PAUL D. ORMEROD, JR.,**

                    **Defendants.**
_____


**APPEARANCES:**                  **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

Office of Robert N. Isseks        ROBERT N. ISSEKS, ESQ.
6 North Street
Middletown, NY 10940

Office of Evan M. Foulke         EVAN M. FOULKE, ESQ.
1997 Route 17M
P.O. Box 239

Goshen, NY 10924

**FOR THE DEFENDANTS:**

Office of M. Randolph Belkin          M. RANDOLPH BELKIN, ESQ.
26 Century Hill Drive
Suite 202
Latham, NY 12110

Carter, Conboy Law Firm          WILLIAM T. LITTLE, ESQ.
20 Corporate Woods Boulevard
Albany, NY 12211

**Gary L. Sharpe**
**U.S. District Judge**

## DECISION AND ORDER

### I. Introduction

This First Amendment retaliation action presents another example of what happens when grown men act like five year olds.  Ex-volunteer firefighters Joel and Ricky Shanks contend that defendants subjected them to harassment and threats because they reported safety violations by the Catskill Fire Company (the "Company") to the U.S. Occupational Safety and Health Administration ("OSHA") and the NYS Public Employee Safety and Health Bureau ("PESH").  Pending are all defendants' motions for summary judgment seeking dismissal of plaintiffs' action.  (See Dkt. Nos. 52, 53.)  For the reasons that follow the motions are denied.

2

## II. **Facts**[1]

At all times pertinent to this action, plaintiffs Ricky and Joel Shanks were volunteer firefighters for the Village of Catskill, the defendant Catskill Fire Department and the defendant Company.  (See Am. Compl. ¶ 25, 26; Dkt. No. 30.)  Defendants Jim Chewens, Forest Cotton, Angelo W. Amato, Joseph Kozloski and Vincent Seeley (collectively "Village Board defendants") are all members of the defendant Village of Catskill Board of Trustees.  (*See id.* at ¶¶ 11, 15-17, 20.)  Defendants Steve Schultz, Hank Coons, Rick Chewens, Paul Overbaugh and Harold Rivenburg (collectively "Company Board defendants") are all Board members of the Company.  (*See id.* at ¶¶ 12-14, 18-19.)  The remaining defendants are all firefighters and officers in the Company (collectively "defendant firefighters").  (*See id.*

---

[1]The relevant facts are derived from the parties' 7.1 statements and the record on this matter, and are stated in the light most favorable to the plaintiffs as the non-moving parties. The court notes that defendants have objected to plaintiffs' reliance on the amended complaint in setting forth the pertinent facts.  "However, a verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."  *See, e.g., Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004).  Here, both Joel and Ricky Shanks have submitted affidavits swearing to the amended complaint's accuracy and incorporating the allegations therein by reference.  (*See* Dkt. Nos. 56, 57.)  As such, plaintiffs' use of the amended complaint as evidence is proper, though the court will not consider allegations therein which are clearly based on information and belief, rather than plaintiffs' personal knowledge.  (*See* Am. Compl. ¶¶ 43, 52, 53, 56, 61, 62, 64, 67, 68, 77, 81, 83-85, 91, 100, 123; Dkt. No. 30.)  In a similar vein, the court notes that defendants have referenced a plethora of facts in their briefs which do not appear in their 7.1 statements, and which the court therefore does not consider.  This includes all facts relating to the blog of which Ricky Shanks is the author.

at ¶¶ 5-10, 21.)

On October 4, 2005, Joel Shanks anonymously reported multiple safety violations allegedly committed by the Company to OSHA and PESH. (*See id.* at ¶ 27.)  These violations included outdated aerial ladder inspection, lack of safety equipment, firefighters with facial hair wearing "SCBA's," outdated equipment, lack of training and standards and failure to follow OSHA standards.  (*See id.*)  Thereafter, the following events, among others, occurred :

- At a firefighter meeting on October 4, 2005, Company Chief Randy Ormerod told the firefighters to keep their mouths shut, and Village Board Member and Fire Chairperson, Jim Chewens, indicated that when they found out who filed the complaint they were "going to take care of business."  (*See id.* at ¶ 28.)

- During an October 26, 2005 PESH investigation, Second Lieutenant John Dees told Joel Shanks that whoever made the complaint was going to be thrown out.  (*See id.* at ¶ 29.)

- At a fireman's funeral in October 2005, Randy Ormerod stated to firemen and civilians that if he became a paid village fire chief he would "throw out the scumbag Shanks boys."  (*See id.* at ¶ 30.)

- Since October or November of 2005, defendants have refused to issue plaintiffs firefighter shields for their helmets, to place them on the Fire Department website list of members, or to qualify them as ladder truck drivers even though they had passed the necessary road test.  (*See id.* at ¶¶ 31, 32, 33.)

4

- From November of 2005 to March 14, 2006, the President of the Company Board, Harold Rivenburg, and Company Board Member, Hank Coons, frequently stated they were in the process of creating a disharmony law in order to throw out those who reported violations.  (*See id.* at ¶ 34.)

In December and January of 2006, Joel Shanks filed complaints with PESH regarding harassment by defendants.  (*See id.* at ¶¶ 36-37.)  In January of 2006, Ricky Shanks also submitted a complaint with PESH about safety violations at the Catskill Firehouse, which included improper vehicle maintenance, unqualified operators, un-repaired equipment, falsification of paper work and outdated aerial ladder inspections.  (*See id.* at ¶ 38.)  These complaints were made anonymously.  Afterwards the following events, among others, occurred:

- At a January 2006 Company meeting the President of the Village Board, Vincent Seeley, as well as Randy Ormerod, Jim Chewens and Rivenburg all threatened to punish whoever made the safety complaints while staring directly at Joel Shanks.  (*See id.* at ¶ 42.)

- Company Captain Neal Russell and Jack Ormerod would assign plaintiffs menial tasks normally performed by less experienced or probationary firefighters.  (*See id.* at ¶¶ 49, 74.)

- Steve Schultz, a Company Board Member, would call plaintiff[2] a "rat" and "scumbag" at Sunday morning breakfast.  (*See id.* at ¶

---

[2] It is not clear from the complaint which plaintiff these insults were directed at.

5

50.)

- In January of 2006 Seeley stated that he was going to find out who turned in the Village and "they were going to have hell to pay."  (*See id.* at ¶ 51.)

- In February of 2006, Dees told Joel Shanks that he had to wear a new shield on his helmet.  When Shanks noted other non-complying helmets Dees began cursing Shanks, said he was nothing but a troublemaker, and stated that Shanks should be reported "to the village or PESH."  Darling and Rivenburg were both present and laughing during this occurrence.  On March 2, 2006, Shanks received a letter stating he had to appear in front of the Board of Directors of the Catskill Fire Company regarding his helmet shield.  (*See id.* at ¶¶ 54, 55.)

In addition to the above, plaintiffs were frequently subjected to thinly veiled physical threats, were harassed with insults such as "rats," "scumbags," and "trouble makers," and were ostracized by the other firefighters.  (*See id.* at ¶¶ 44, 46, 48.)

On March, 3, 2006, the NYS Department of Labor informed the Company that Joel Shanks was alleging discrimination by the Company due to his PESH complaint.  (*See* Def. SMF ¶ 11; Dkt. No. 53:2.)  Around this time, Joel Shanks also voiced concern for his safety to Seeley and Village Board member Forest Cotton.  (*See* Def. SMF ¶ 5; Dkt. No. 52:2.)  On March 13, 2006, the Village Board defendants unanimously voted to place Joel Shanks on administrative leave with full benefits pending

6

completion of an investigation into his allegations of being harassed and not feeling safe.  (*See* Am. Compl. ¶ 57; Dkt. No. 30.)  He was advised not to participate in any Company activities and was removed from the active firefighters list.  (*See id.* at ¶ 59.)  After Joel Shanks was placed on administrative leave, the following events, among others, occurred:

- Company firefighters, including Dees, Jack Ormerod and Paul Overbaugh, would drive by or park outside the Shanks' homes and make obscene gestures, yell insults and threats, and/or blast air horns and sirens late at night.  (*See id.* at ¶¶ 60, 63, 67, 70-71, 80, 98.)

- On June 14, 2006, Randy Ormerod called the police after Joel Shanks drove onto the Catskill Firehouse premises.  Shanks was threatened with arrest and made to leave the property.  (*See id.* at ¶ 69.)

- In October of 2006, Joel Shanks received an invitation to the Company's annual banquet.  Approximately two weeks later, Rivenburg told Shanks that the invitation was sent in error and that Shanks would be asked to leave or escorted off the premises by police if he attempted to attend.  (*See id.* at ¶ 75.)

- On November 13, 2006, Seeley made a speech at the annual banquet in which he stated that the "disgruntled fireman" had been run off, would not be allowed back, and that the fire department was better off without them.  (*See id.* at ¶ 78.)

- In January of 2007, Ricky Shanks' fire helmet was stolen from the firehouse.  Assistant Company Fire Chief Floyd Prince, Jr., refused to issue Shanks a new helmet until PESH demanded he do so.  (*See id.* at ¶¶ 86-89.)

7

In addition to the above, Ricky Shanks continued to be assigned menial tasks and was subjected to verbal harassment by his fellow firefighters.

On June 23, 2007, Ricky Shanks responded to a boat crash on the Hudson River.  (*See id.* at ¶ 90.)  While he attempted to help from the shore, members of the Company who were on a rescue boat continually yelled for him not to jump into the water.  (*See* Def. Ex. P at 109-114; Dkt. No. 52:19.)  Due to all the noise Shanks yelled "shut up" on the scene. (*See id.*)  After this incident, Chewens,[3] Prince, Jack Ormerod, Rivenburg and other firefighters met at the firehouse and then walked in a line past Ricky Shanks with smirks on their faces, while another firefighter stated "we got him out now."  (*See* Am. Compl. ¶ 92; Dkt. No. 30.)  Dees and other Company firefighters then falsely claimed that Shanks had disobeyed orders not to enter the water during the rescue, and in response to such orders had stated "shut the fuck up.  I don't need to listen to you."  (*See* Am. Compl. ¶¶ 92-94; Dkt. No. 30, Def. Ex. P at 109-114; Dkt. No. 52:19.) That same day Rivenburg issued a letter ordering Ricky Shanks to appear before the Company Board on charges arising out of this incident.  (*See* Am. Compl. ¶ 95; Dkt. No. 30.)  After a Company Board hearing on July 3,

---

[3]It is unclear which Chewens took part in this incident.

2007, Shanks was suspended for thirty days.  (*See id.* at ¶¶ 96-97.)

On September 25, 2007, Ricky Shanks received another letter from Rivenburg directing him to appear before the Company Board on November 27, 2007, to face charges for violating the Company's standard operating procedures, making derogatory remarks about members of the Company, and for engaging in conduct which was prejudicial to the best interest of the Company.  (*See id.* at ¶¶ 105-08.)  Though Shanks informed the Board that he could not attend the hearing on November 27th, it was nevertheless held on that date.  (*See id.* at ¶ 109.)  Thereafter, on December 3, 2007, Rivenburg issued a letter which informed Ricky Shanks that the Company Board had voted to expel him from the Company effective immediately.  (*See id.* at ¶ 110.)  Subsequently, on March 13, 2008, Joel Shanks was terminated as a volunteer firefighter by the Village Board, despite having informed them on January 28, 2008 that he had been suspended against his will, no longer felt his safety was threatened and wished to be reinstated to the Company.  (*See id.* at ¶¶ 120-22.)  This action ensued.

Presently the court addresses defendants' motion for summary judgment on plaintiffs' sole remaining claim, which alleges retaliation in

9

violation of their First Amendment rights under 42 U.S.C. § 1983.[4]

### III. <u>Standard of Review</u>

The standard for the grant of summary judgment is well-established, and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### IV. <u>Discussion</u>

### A.   <u>First Amendment Retaliation Standard</u>

"[W]hile the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001). Accordingly, a public employee[5] may

---

[4]The court notes that plaintiffs' complaint also states a claim under N.Y.S. EXEC. LAW § 740 which has not been previously dismissed. However, the cited provision deals with the State Board of Social Welfare and is entirely irrelevant to the current case. While it seems likely that plaintiffs intended to invoke N.Y.S. LABOR LAW § 740, they have not clarified the issue, despite defendants' expressed confusion and arguments for dismissal of the claim. As such, the claim is deemed withdrawn. *See, e.g., Beers v. Gen. Motors Corp.*, No. 97-CV-482(NPM/DNH), 1999 WL 325378, at *9 (N.D.N.Y. May 17, 1999) (indicating that a failure to respond to an issue may be treated as a concession for purposes of summary judgment).

[5]Though Joel and Ricky Shanks were volunteer firefighters, the parties do not dispute that they qualify as public employees. *See, e.g., McClernon v. Beaver Dams Volunteer Fire Dep't.*, 489 F. Supp. 2d 291, 295 (W.D.N.Y. 2007) (assuming volunteer firefighters are public employees).

establish a First Amendment retaliation claim against his governmental

employer under 42 U.S.C. § 1983 upon proof "that: (1) his or her speech

was constitutionally protected; (2) he or she suffered an adverse

employment action; and (3) a causal connection exists between the speech

and the adverse employment action."  *Washington v. County of Rockland*,

373 F.3d 310, 320 (2d Cir. 2004).  If these three factors are satisfied, the

government may still avoid liability if it makes one of two showings.  "The

government may either (1) demonstrate by a preponderance of the

evidence that it would have taken the same adverse action regardless of

the protected speech, or (2) show that the plaintiff's expression was likely

to disrupt the government's activities, and that the likely disruption was

sufficient to outweigh the value of the plaintiff's First Amendment

expression."  *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).  With these

principles in mind the court turns to the matter at hand.

### 1.  Protected Speech

The First Amendment protects a public employee's speech only when

it is "made as a citizen on matters of public concern rather than as an

employee on matters of personal interest."  *Johnson v. Ganim*, 342 F.3d

105, 112 (2d Cir. 2003) (internal citations and quotation marks omitted).

"Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Id.* (quoting *Connick v.Myers*, 461 U.S. 138, 146 (1983)).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.

In the present case, Joel Shanks reported various Company safety violations to OSHA and PESH in October of 2005, as described above. Ricky Shanks did the same in January of 2006.  Defendants concede that these complaints clearly qualify as speech on matters of public concern under the First Amendment.[6]

### 2.  Adverse Employment Action

"In the context of a First Amendment retaliation claim, [the Second Circuit has] held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action."  *Zelnik v. Fashion Inst.*

---

[6]Despite this initial concession, counsel for the defendant firefighters contrarily argues in his reply brief that plaintiffs' speech is not entitled to protection because it was motivated by personal interests.  As it is inappropriate to raise new arguments in a reply brief - especially those directly opposite to prior concessions - the court does not consider this argument.  *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

*of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006) (internal citations, quotation marks and brackets omitted).  Under this definition, "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  *Id.* at 226 (internal citations, quotation marks and brackets omitted).  However "lesser actions" such as negative reviews, false accusations, and menial job assignments "may also be considered adverse employment actions."  *Id.*; *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  Finally, while relatively de minimis incidents standing alone will not give rise to a First Amendment retaliation claim, "a combination of seemingly minor incidents [may] form the basis of a constitutional retaliation claim once they reach a critical mass" and create "a working environment unreasonably inferior to what would be considered normal for that position."  *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

     In the present instance, the verified complaint paints a picture wherein plaintiffs have been subjected to a sustained, systematic course of verbal harassment, threats, ostracism and generally demeaning behavior in order to drive them out of the Company.  Further, each of the firefighter defendants, and many of the Company and Village Board defendants,

allegedly took part in or failed to stop this behavior.  For example, the verified complaint alleges that: Company Board President Rivenburg, Village Board President Seeley, and Fire Chairperson Jim Chewens threatened to punish whoever made the safety complaints while starring at Joel Shanks (*See* Am. Compl. ¶ 42; Dkt. No. 30); Captain Neal Russell and Jack Ormerod would assign plaintiffs menial tasks normally performed by probationary firefighters (*See id.* at ¶¶ 49, 74); Second Lieutenant John Dees, Jack Ormerod and Company Board member Paul Overbaugh, would drive by or park outside the Shanks' homes and make obscene gestures, yell insults and threats, and/or blast air horns and sirens late at night (*See id.* at ¶¶ 60, 63, 67, 70-71, 80, 98); Assistant Company Fire Chief Floyd Prince, Jr., refused to replace Ricky Shanks' stolen helmet until PESH demanded he do so (*See id.* at ¶¶ 86-89); and the Company Board defendants brought Ricky Shanks up on false charges based upon misrepresentations by the firefighter defendants regarding the June 23, 2007 water rescue (*See id.* at ¶¶ 90, 92-97).

These actions alone would be enough to establish adverse employment action under a "critical mass" theory.  *See Phillips*, 278 F.3d at 109; *see also Zelnik*, 464 F.3d at 226.  However, the court also notes that

14

Joel Shanks was ultimately terminated by the Village Board defendants for reasons which have not been explained, while Ricky Shanks was terminated by the Company Board defendants upon purportedly false allegations regarding the June 23, 2007 water rescue.  (*See* Am. Compl. Exs. L & M; Dkt. Nos. 30:14, 15.)  As termination clearly qualifies as an adverse employment action, *see Zelnik*, 464 F.3d at 225, this is the final nail in the coffin on the issue.

### 3. Causation

The last showing which must be made for a plaintiff to establish a First Amendment retaliation claim is a causal relationship between the protected speech and the adverse employment action.  "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."  *Morris*, 196 F.3d at 110 (internal citation omitted).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  *Id.* (internal citation omitted).

15

"Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Id.* (internal citation omitted).

In the present instance, defendants contend that Joel Shanks cannot establish the necessary causal relationship because defendants were not aware of his OSHA and PESH complaints until they received a letter from the NYS Department of Labor regarding such complaints on March 3, 2006, while after such date Shanks was not subjected to adverse employment action.  The court cannot agree.

First, Joel Shanks clearly alleges many adverse actions occurring after March 3, 2006, including his termination on March 18, 2008.  (*See* Am. Compl. ¶¶ 63, 66, 69, 70, 71, 75, 79, 80, 122; Dkt. No. 30.)

Further, the verified allegations in the complaint indicate that, as early as October of 2005, defendants were aware of, or at least suspected, that the Shanks had filed the anonymous complaints with OSHA and PESH, and that the systematic course of harassment which ensued was the direct result of this knowledge or suspicion.  For example, plaintiffs contend that: on October 4, 2005 - the date the initial PESH and OSHA complaints were

16

filed - Randy Ormerod and Jim Chewens told the firefighters to keep their mouths shut and indicated when they found out who was causing problems they were "going to take care of business"[7] (*See id.* at ¶ 28); on October 26, 2005, Dees made a similar statement to Joel Shanks at a PESH investigation (*See id.* at ¶ 29); in October of 2005 Randy Ormerod stated that if he ever became a paid fire chief "the first thing he would do is throw out the scumbag Shanks boys" (*See id.* at ¶ 30); in January of 2006, Seeley, Randy Ormerod, Jim Chewens and Rivenburg all threatened to punish whoever made the safety complaints while staring directly at Joel Shanks (*See id.* at ¶ 42); beginning in January of 2006 plaintiffs were repeatedly called "rats," "troublemakers," and other names synonymous with whistle blowers, and, during one such incident in February of 2006, Dees told Joel Shanks that he was nothing but a troublemaker and should be reported to "the village or PESH," to which Darling and Rivenburg laughed (*See id.* at ¶¶ 44, 46, 48, 54).  In light of these verified allegations, there is more than enough evidence for a jury to find that defendants knew or suspected prior to March 3, 2006 that Joel Shanks had made complaints

---

[7]Defendants contend that the initial OSHA and PESH complaints were filed after this incident, but fail to provide any record cite supporting that contention.

to PESH and OSHA, and that such knowledge and suspicion was the reason the Shanks were subjected to adverse employment actions. *See Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir. 2003) (finding issue of fact as to causal relationship based on direct evidence of retaliation for protected speech).

As to Ricky Shanks, defendants contend that a causal relationship between the protected speech and defendants' adverse employment action is absent because Shanks was not terminated in retaliation for his PESH complaint, but rather for inappropriate behavior during the June 23, 2007 water rescue. However this argument does no more than raise a disputed issue of fact, as Ricky Shanks has averred that the allegations of misconduct upon which he was terminated are false. (*See* Am. Compl. ¶¶ 90, 92-97; Dkt. No. 30, Def. Ex. P at 109-114; Dkt. No. 52:19.)

Additionally, the court rejects defendants' contention that the length of time between Ricky Shanks' January 2006 complaint and December 2008 termination breaks the potential causal connection between the protected speech and the discharge. Despite the delay between Shanks' complaint and his termination, there is abundant evidence that defendants' harassing and threatening conduct continued unabated throughout this

18

period and was related to the PESH and OSHA complaints.  *See also*

*Mandell*, 316 F.3d at 384 (finding evidence other than temporal proximity

can raise issue of fact as to causal relationship).  Accordingly, plaintiffs

have adduced sufficient evidence to allow a jury to reasonably find that

defendants' adverse actions were motivated by retaliatory animus.

### 4.  Government Justification

As the plaintiffs have established a valid First Amendment retaliation

claim, it becomes incumbent upon the defendants to show either that they

"would have taken the same adverse action in the absence of the protected

speech" or that "plaintiff's speech would disrupt the government's activities

and such disruption is sufficient to outweigh the First Amendment value of"

such speech.  *Locurto*, 264 F.3d at 166 (internal citation omitted).  The

latter analysis is known as the "*Pickering* balancing test," and presents a

question of law which the court must resolve.  *See id.* (internal citation

omitted).

"Under the *Pickering* test, a government employer may fire an

employee for speaking on a matter of public concern if (1) the employer's

prediction of disruption is reasonable; (2) the potential disruptiveness is

enough to outweigh the value of the speech; and (3) the employer took

action against the employee based on this disruption and not in retaliation for the speech." *Id.* at 166 (internal citations and quotation marks omitted). In applying this balancing test, courts may consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (internal citation omitted). Further, "[t]he 'manner, time, and place' in which the speech occurs is important in determining whether it is protected." *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999) (quoting *Connick*, 461 U.S. at 152). "For example, the *Pickering* balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers." *Id.* (citing *Connick*, 461 U.S. at 152-53). "The weight afforded each side of the Pickering balance also varies with the content of the speech. The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Id.* (citing, e.g.,

*Connick*, 461 U.S. at 152).

Here, defendants invoke the *Pickering* balancing test and rely on two cases - *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17 (2d Cir. 1979) and *McClernon v. Beaver Dams Volunteer Fire Dept., Inc.*, 489 F. Supp. 2d 291 (W.D.N.Y. 2007) - in contending that their actions were justified due to their interest in maintaining an "esprit de corps" among the Company firefighters.  The court cannot agree.

In *Janusaitis*, the volunteer firefighter plaintiff was terminated after he threatened to inform the IRS of accounting irregularities within the fire department, indicated he would sue after such threats led to his suspension, threatened to run a negative newspaper article on the department, and eventually did publish such an article.  *See Janusaitis*, 607 F.2d at 18-19.  Subsequently, the plaintiff filed a First Amendment retaliation claim, which the district court dismissed.  *Id.* at 25.  On appeal, the Second Circuit affirmed, finding that "[t]he appellant's use of threats and his impatience with the process of investigation and correction threatened institutional efficiency by the manner, time and place in which it was delivered."  *Id.* at 26.

Similarly, in *McClernon*, the volunteer fire chief plaintiff sent a letter to

21

various government officials, agencies and surrounding departments complaining that those departments had received grants despite the fact that they didn't need the money or had misappropriated funds. *See McClernon*, 489 F. Supp. 2d at 292-94. Thereafter, the plaintiff was terminated upon a finding that his letter had a "detrimental impact" on the department and its relationship with neighboring departments, and a First Amendment retaliation claim was correspondingly filed. *Id.* at 295. In dismissing such claim, the district court found defendants' termination of the plaintiff was justified "on grounds that the plaintiff's speech was damaging to the Department and detrimental to the functioning of the Department," and because "the purpose of the letter was not to expose public wrongdoing or corruption, but instead, served as a vehicle for [the plaintiff] to express his frustration that his department had again been passed over for receipt of grant money." *Id.* at 296-97.

The facts of this case differ greatly from those present in *McClernon* and *Janusaitis*. Here, defendants point to no evidence indicating plaintiffs made openly abrasive complaints or threats to members of the Company or other departments. Rather, plaintiffs' safety complaints were made anonymously to OSHA and PESH, which indicates a desire to maintain

22

harmony within the Company.  This weighs heavily against the defendants.

*See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d

Cir. 1987) (finding firefighter's complaints about gender discrimination and

closed department meetings were not so abrasive or disruptive as to justify

termination).  Further, insofar as plaintiffs' speech addressed the adequacy

of Company training and the integrity of Company equipment, it touched on

matters of far greater public concern than complaints about accounting

practices or the disbursement of grant money.  Indeed, plaintiffs'

complaints went to the very heart of the Company's ability to effectively and

safely perform its public function.  Finally, while there is certainly evidence

that plaintiffs would not be welcomed back into the Company, defendants

have presented no evidence that the regular operation of the Company

was significantly disrupted by plaintiffs' speech.  *See id.* at 58-59.

Thus, given the great public concern of plaintiffs' speech, the non-

abrasive manner in which it was made, and the relatively slim evidence of

Company disruption resulting therefrom, the court finds that defendants'

interest in maintaining an esprit de corps did not outweigh plaintiffs'

exercise of free speech.  Additionally, even if the court were to assume that

plaintiffs' speech caused a significant disruption in the functioning of the

Company, there is, as discussed above, a plethora of evidence indicating that defendants' adverse action was not in response to such disruption, but rather in retaliation for plaintiffs' speech.  *See Locurto*, 264 F.3d at 166-67 (stating "even if the *Pickering* balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption" (internal citations and quotation marks omitted)). Accordingly, defendants' motion for summary judgment on plaintiffs' First Amendment retaliation claim is denied.[8]

## B.   Monell Liability

Next, counsel for the Company argues that plaintiffs' retaliation claims must be dismissed against the Company and the Village of Catskill Fire Department because plaintiffs have failed to allege an unconstitutional policy or procedure as necessary to sustain § 1983 liability against municipal defendants.

Before addressing the substance of this argument, the court notes that counsel for the Company does not represent the other municipal

---

[8]The court acknowledges defendants' related argument that reinstatement is impractical in this case, and should be denied.  While the point is well taken, it is unnecessary to decide the issue at the current juncture.

defendants- the Village of Catskill Board of Trustees and the Village of

Catskill Fire Department.  Normally, this point would be irrelevant, as a suit

against any municipal entity is, in reality, a suit against the municipality

itself.  However, in the present instance there is an outstanding issue as to

whether the Company even qualifies as a municipal entity.  (*See* Dkt. No.

28.)   While the Company is now apparently willing to concede that it is a

municipal entity - despite its arguments to the contrary at the motion to

dismiss stage - this concession is obviously contrary to the interests of the

municipality.  Thus, while the court addresses the Company's argument

based upon the assumption that it is a municipal entity, it does not

foreclose the other municipal defendants from making an argument to the

contrary in the future.

That being said, a municipality may be liable under § 1983 "when

execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of

N.Y.*, 436 U.S. 658, 694 (1978).  "To establish the existence of a municipal

policy or custom, the plaintiff must allege: (1) the existence of a formal

policy officially endorsed by the municipality; (2) actions taken or decisions

made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." *Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 174 (S.D.N.Y. 2006) (internal citation omitted).

Again, plaintiffs' verified allegations in the present instance indicate that various Company and Village Board defendants, including the presidents of both Boards, subjected plaintiffs to harassment and threats. This culminated in plaintiffs' termination by the Company and Village Board defendants in alleged violation of plaintiffs' First Amendment rights. Further, there is evidence that plaintiffs were subjected to pervasive, retaliatory threats and harassment by various firefighters and officers in the Company, such that constructive knowledge of these actions can be implied on the part of municipal policymaking officials. Accordingly, plaintiffs have adequately alleged a Monell claim.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motions for summary judgment (Dkt.

Nos. 52, 53) are **DENIED**, except to the extent that they seek dismissal of

plaintiffs' claims under N.Y.S. EXEC. LAW § 740; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this order to

the parties by regular mail.

**IT IS SO ORDERED.**

September 2, 2009
Albany, New York

_____
United States District Court Judge

27